IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DESMON LOEB,

      Plaintiff,                        No. CIV S-04-0730 LKK EFB P

  vs.

T. FELKER, et al.,

      Defendants.                 <u>FINDINGS AND RECOMMENDATIONS</u>

      This matter is before the court on cross-motions for summary judgment. Plaintiff is a prisoner, without counsel, suing for alleged civil rights violations. *See* 42 U.S.C. § 1983. This action proceeds on plaintiff's April 12, 2004, verified complaint. He claims that his Eighth Amendment rights were violated when he was placed in "management cell status."[1] Specifically, he alleges that during his confinement on management cell status he was not fed for a day, not allowed outdoor exercise for ten days, and was stripped of "necessities," including a

---

    1 Management Cell Status is a form of administrative segregation or isolation of an inmate who persists in disruptive, destructive or dangerous behavior, and who will not respond to orders and warnings to stop the offending behavior. Defs.' Ex. B (Department Operations Manual, § 52080.22.4). Inmates placed on Management Cell Status receive one t-shirt, one pair of socks, one pair of boxer shorts, and one blanket. *Id*. Inmates on Management Cell Status are not allowed yard access. Additionally, the water to the inmate's cell is turned on for only five minutes each hour during second and third watch. On first watch, water to an inmate's cell is turned on for five minutes, and by inmate request only. *Id*. The Facility Captain reviews all Management Cell cases every 24 hours to determine whether the inmate should remain on that status. *Id*.

mattress. He claims this constitutes cruel and unusual punishment in violation of the Eighth Amendment. He also alleges that defendants violated his Fourteenth Amendment rights by placing him into administrative segregation on management status without affording him all the process he was due.

Defendants move for summary judgment on the grounds that plaintiff was placed in management cell status for legitimate reasons and that the conditions and limited time duration under which he was held do not constitute cruel and unusual punishment. Defendants also argue that they are entitled to qualified immunity. Plaintiff cross-moves for summary judgment claiming that his placement in management cell status is undisputed and that it violated his rights. For the reasons explained below, defendants' motion must be granted.

**I.      Summary Judgment Standards**

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[2] The standards under Rule 56 to determine whether there is a genuine dispute over material issues fact are well established.

> In three recent cases, the Supreme Court, by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment. First, the Court has made clear that if the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Second, to withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis added). Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more

---

[2] On April 19, 2005, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

> persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). No longer can it be argued that *any disagreement* about a material issue of fact precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added). In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).

## II.   Facts

Following his conviction for manslaughter, evading an officer, and assault with a firearm, plaintiff was incarcerated at High Desert State prison where he was located during the times here in issue. Defs.' Ex. A, Attach. 1. Defendant T. Felker was an Associate Warden, defendant R. Ingwerson was a Lieutenant, defendant D. Peddicord was a Facility Captain, defendant A. Martin was Correctional Sergeant, and defendants J. Barron and C. Kramer and K. Stephens were Correctional Officers at High Desert State prison. Compl., at § III.

On May 1, 2001, a disturbance broke out on Facility D, Yard 1. After quelling the disturbance, prison staff searched the yard and found several weapons. Defs.' Ex. A-1, at 13. Officer Pointer ordered plaintiff, who was on the ground, to stand up because it was necessary to perform an unclothed body search on him, but plaintiff refused. *Id.,* at 14. Officer Pointer assisted plaintiff to his feet. *Id*. Plaintiff physically resisted the search such that two officers were necessary to restrain him. *Id.,* at 14, 16. He finally complied with an order to get on the ground, whereupon the officers placed him in restraints and carried him off the yard. *Id*., at 14, 16. Based on this, prison officials considered plaintiff to be a threat to the safety and security of the institution, placed him in an administrative segregation and issued a disciplinary charge (Log. No. FD-01-05-00) of willfully resisting a peace officer. *Id*., at 13, 14, 16. The hearing on

this charge was delayed because the prison was in a state of emergency. *Id.,* at 13.

Following his placement in administrative segregation, plaintiff engaged in a pattern of disruptive behavior. The day of his release, May 10, 2001, plaintiff refused to enter his assigned cell and refused to be housed with a roommate. *Id.,* at 20, 21. He was returned to administrative segregation and a disciplinary report (Log. FD-01-05-0017) was issued charging plaintiff with refusing to accept a compatible cellmate. *Id.,* at 20, 21. On the date he was to be released from administrative segregation, May 22, 2001, after being released for a shower, he again refused to return to his assigned cell. *Id.*, at 26. Prison officials therefore retained him in administrative segregation. *Id.* Again, on June 23, 2001, he again refused to follow an order to return to his cell, for which he was charged with delaying a peace officer (Log. FD 01–06-0035). He also was placed on management control. *Id.,* at 27, 33. A state of emergency caused a delay in the hearing on these charges, also. *Id.,* at 23, 27

Plaintiff's pattern of disruptive behavior continued in June and July 2001. On June 24, 2001, while still on management status, he was found to have fashioned a rope out of his sheet and to have wrapped it around his neck. *Id.,* at 31. He was admitted to the infirmary, where he informed staff that he was having trouble with his cell mate, and he thought that the only way to get out of his cell was to tell them he was suicidal. *Id.,* at 33. He remained in the infirmary until June 25, 2001, when he was released to the general population. *Id.,* at 2, 33.

On July 1, 2001, while feeding prisoners, Officer Kramer noticed water coming out from under the door of plaintiff's cell, and saw plaintiff stuffing the toilet and repeatedly flushing, causing the toilet to overflow. *Id.,* at 36. Officer Kramer had the water to plaintiff's cell cut off because plaintiff refused multiple orders to stop, thereby flooding the day room floor. *Id.* Plaintiff was charged with flooding his cell and "C" section (Log. FD-01-07-0001) and was placed on management status. *Id.,* at 36, 40. Prison officials planned to release him on July 2, 2001, but at around 6:30 a.m., plaintiff threatened to douse officers Barron and Cartier with urine and feces if they fed him. *Id.,* at 40. On the order of a captain, plaintiff was retained on

4

management status, and a rules violation report was issued (Log. FD-01-07-0024). *Id.,* at 40, 43, 54. Prison records show that on July 2, 2001, plaintiff did not receive breakfast or lunch, but he did receive dinner. *Id.,* at 54. Plaintiff was removed from management control status on July 2, 2001. *Id.* It appears that this occurred before plaintiff was given dinner. *Id.*

As stated above, the hearings on plaintiff's disciplinary charges were delayed because of a state of emergency. Accordingly, on July 7, 2001, a disciplinary hearing on the May 1, 2002, charge of refusing to accept a compatible cellmate, i.e., disobeying an order, (Log. FD-01-05-0017) was held before Lt. R. Plainer. *Id.,* at 20, 21, 23. Plaintiff waived his right to a staff assistant and Lt. Plainer found that since the charge was not complex, he did not need the assistance of an investigative employee. *Id.,* at 23. Plaintiff did not request any witnesses. *Id.* He pled not guilty, acknowledged that he understood the charges against him and stated that he would not "cell with anyone I don't know." *Id.,* at 24. After considering plaintiff's statement and the report of plaintiff's misconduct, Lt. Plainer found plaintiff guilty of the offense and assessed plaintiff 30 days of time credits. *Id.*

The hearing on the May 2, 2001, disciplinary charge of willfully resisting a peace officer (Log. No. FD-01-05-00) was delayed until August 18, 2001. *Id*., at 14. Plaintiff appeared before a lieutenant who is not a defendant. Plaintiff had the opportunity to call witnesses, but declined to do so. *Id*., 14-15. After pleading not guilty, plaintiff declined to make a statement. *Id*., at 15. Based on the incident report, Officer Ingwerson's statement, and the Investigative Employee's report, plaintiff was found guilty of resisting a peace officer and lost 90 days of time credit. *Id*., at 15-16.

The hearing on the June 23 charge of delaying a peace officer (Log. FD 01–06-0035) was held on August 12, 2001. *Id.,* at 27. The Senior Hearing Officer, not a defendant in this action, determined that plaintiff did not meet the criteria for having the assistance of a staff assistant or an investigative employee. *Id.* Plaintiff stated that he understood the charge, pled not guilty and in his defense stated, "I didn't do nothing." *Id*., at 28. Plaintiff was found guilty based on the

5

1  contents of the report written by defendant Stephens, and lost 90 days of time credit. *Id.*

2  On August 27, 2001, plaintiff appeared for a hearing on the July 2, 2001, charge of
threatening staff with urine and feces (Log. 01-07-0024). *Id.,* at 40. Plaintiff waived the
assignment of a staff assistant. *Id.,* at 41. An investigative employee was assigned, who spoke
to plaintiff, the reporting officer, J. Cartier, and an unidentified staff member. Plaintiff stated
that he had, "no comment." *Id.,* at 44. Plaintiff was found guilty and assessed 60 days loss of
credit, and restricted from yard access for 10 days, starting August 26, 2001, and ending
September 5, 2001. *Id.*, at 41. The finding of guilt was based on the disciplinary report,
defendant Sergeant Peddicord's statement, defendant Officer Chandler's statement, and evidence
obtained through the Investigative Employee's report. *Id.*, at 41.

On August 27, 2001, plaintiff appeared for a hearing on the July 1, 2001, charge of
flooding his cell and "C" section (Log. FD-01-07-0001). *Id.,* at 36. Plaintiff waived the
assignment of a staff assistant, but he was assigned an investigative employee. *Id.,* at 36-37.
The investigative employee interviewed plaintiff, who stated that he had "no comment." *Id.,* at
39. He also spoke to the reporting officer, R. Kramer, and a prisoner named Martin. Kramer
said that he discovered the violation when he entered the dayroom, saw water coming out of
plaintiff's cell and heard flushing therefrom. *Id.* Martin said that plaintiff flooded the dayroom
because prison staff twice refused to give him dinner. *Id.* Plaintiff had the opportunity to call
witnesses, and he initially requested that R. Kramer and Inmate Martin, be present . *Id.,* at 37,
39. Plaintiff later rescinded this request. *Id.*, at 37. The Senior Hearing Officer, Lt. R. Plainer,
considered the disciplinary report and found plaintiff guilty. *Id.* Plaintiff was assessed 30 days
of time credits. *Id.*

**III.  Analysis**

The substantive law will determine whether a particular dispute is material. Here, the
substantive law is Section 1983 and the Eighth Amendment and Fourteenth Amendments.

////

6

Plaintiff claims that he was subjected to cruel and unusual punishment because he was not served dinner on July 1, 2001, or breakfast and lunch on July 2, 2001. He also alleges that he was denied "necessities" while on management status. Finally, he alleges that he was denied yard privileges of 10 days. Yet, the unrefuted evidence shows that plaintiff missed breakfast and lunch on July 2, 2001, because of his own misconduct, including threatening officers. Thus, he was place on yard restriction and suffered the consequences of being in management cell status. But these conditions do not rise to the level of an Eighth Amendment violation.

      To violate the Eighth Amendment, the conditions complained of must be "sufficiently serious" to implicate constitutional rights. *Farmer*, 511 U.S. at 834. The Eighth Amendment's prohibition on cruel and unusual punishment "'does not mandate comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'" *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir.1998) (*quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Rather, a prisoner must show facts that rise to the level of "conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. In general, the severity and duration of the deprivation are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while "substantial deprivations of shelter, food, drinking water, and sanitation" may meet the standard despite a shorter duration. *Johnson v. Lewis*, 217 F.3d 736, 732 (9th Cir. 2000); *see also Witnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994) ("the length of time required before a constitutional violation is made out decreases as the level of filthiness increases.").

      Defendants have presented evidence that plaintiff was on management status three times -- June 24, 2001, July 1, 2001, and July 2, 2001. The June 24, 2001, placement on management cell status followed a serious disciplinary infraction and lasted only a few hours. After threatening suicide, he was admitted to the infirmary and placed in a crisis bed on suicide watch. He remained in the infirmary for two days, and was then transferred to general population. California's regulations permit prison officials to place a prisoner on management cell status if

1 he persists in disruptive, destructive or dangerous behavior (i.e. cell extraction, refusal to exit the
2 yard, etc.). While on management status, a prisoner receives one t-shirt, one pair of socks, one
3 pair of boxer shorts, and one blanket. He also may be denied yard access. While plaintiff argues
4 that these conditions are harsh, they are not sufficiently serious to be violative of the Eighth
5 Amendment. *Johnson v. Lewis*, 217 F.3d at 732. Plaintiff was on management cell status for
6 relatively short periods of time to address his refusals to follow orders, and the limited duration
7 of those time periods counsels against finding an Eighth Amendment violation. *Id.* The
8 measures taken to respond to each of plaintiff's episodes of disruptive behavior were reasonable.
9 On the evidence presented here, no reasonable jury could find in plaintiff's favor on this claim.

10 Defendants also presented evidence refuting plaintiff's claims that he was denied food
11 for days at a time. That evidence is uncontraverted and shows that the few meals plaintiff
12 missed were occasioned by plaintiff's own disruptive conduct. On July 1, 2001, while cell
13 feeding of the prisoners was taking place, plaintiff was seen flooding his cell. He was ordered to
14 stop, but he refused. Instead, he continued to flush his toilet until he flooded the tier. This
15 caused plaintiff to miss a meal. A "substantial" deprivation of food may be sufficiently serious
16 to state a conditions of confinement claim under the Eighth Amendment. *Thompson v. Gibson*,
17 289 F.3d 1218, 1222 (10th Cir. 2002). However, missing one meal does not establish a
18 cognizable constitutional violation. *See LeMaire v. Maas*, 12 F.3d 1444, 1456 (9th Cir. 1993);
19 *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999). It was plaintiff's disruptive behavior that
20 placed him on management cell status, and the conditions imposed and the duration of time he
21 was placed in that status were rationally related to the legitimate penalogical goal of deterring
22 the disruptive behavior. Denying meals to a prisoner does not implicate the Eighth Amendment
23 if the denial is a response to the prisoner's refusal to obey a valid institutional regulation.
24 *Rodriguez v. Briley*, 403 F.3d 952, 952-53 (7th Cir.2005). The inmate's "deliberate
25 noncompliance with a valid rule does not convert the consequences that flow automatically from
26 that noncompliance into punishment . . . . [B]y failing to comply with a reasonable condition on

being allowed to leave his cell, and as a result missing out on meals, [plaintiff] punished himself." *Id.*, at 952-53.

Likewise, prison officials responded reasonably and appropriately to plaintiff's behavior the following day. On July 2, 2001, officers Cartier and Barron were feeding inmates the morning meal. Officer Cartier told plaintiff that he would have to speak with the Sergeant before opening the foodport on plaintiff's cell door. Plaintiff stated, "well, I've got a carton of piss in here, and I'm going to shit in it and throw it at first watch staff." The Sergeant was summoned, and plaintiff was removed from his cell and escorted to the program office. Plaintiff was fed the evening meal. While the denial of food to an inmate may, at some point, violate the Eighth Amendment, the evidence supporting defendants' motion shows that plaintiff was not subjected to the degree of severity necessary to make out a claim of cruel and unusual punishment.

Plaintiff alleges that defendants violated his rights under the Fourteenth Amendment by placing him in administrative segregation without according him a hearing. However, defendants presented uncontraverted evidence that plaintiff's claims are without merit. A prisoner charged with a disciplinary violation does not enjoy the full panoply of rights accorded a criminal defendant. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). In the case of disciplinary hearings, due process is satisfied if the following requirements are met: (1) the prisoner is given written notice of the charge against him at least 24-hours prior to the hearing; (2) the prisoner is given the right to appear in person before an impartial hearing body; (3) the prisoner is allowed the right to call witnesses and to present documentary evidence, and; (4) the prisoner is given a written statement of the reasons for the disciplinary action taken. *Id.,* at 564-571.

Undisputed evidence shows that plaintiff was first placed in administration segregation on May 1, 2001, for resisting an officer. The records establish that plaintiff received notification of the reasons for this placement. The disciplinary hearing was held on August 18, 2001. Plaintiff was given an opportunity to call witnesses, but his initial request for witnesses was rescinded. He was also given an opportunity to make a statement, however, after pleading not

guilty, he chose not to make a statement. He was found guilty based upon the disciplinary report, Officer Ingwerson's statement, and the Investigative Employee's report.

Plaintiff's persistent refusal to follow orders resulted in additional disciplinary violations being issued on May 10, and May 22, 2001. At both hearings, plaintiff was accorded all of the due process protections he was due.

Plaintiff was rehoused in administrative segregation on July 1, 2001, after he flooded the tier. On July 2, 2001, he threatened officers as they were conducting cell feeding of the inmates. Hearings were held on both charges. Plaintiff was given an opportunity to call witnesses and allowed to make a statement at each of these hearings. At each hearing, he pled not guilty and then presented a written statement as evidence. He was found guilty of the disciplinary violations based on the accounts filed by the reporting officers. He disagrees with the results, but the evidence clearly demonstrates that he received all of the procedural protections he was due.

Finally, defendants are entitled to qualified immunity. The threshold inquiry in a qualified immunity analysis is whether a government official violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If government officials violate a constitutional right, the court conducts the following two part inquiry to determine if those officials are entitled to qualified immunity: (1) was the law governing the officials' conduct clearly established; and (2) under that law, could a reasonable state official believe that his or her conduct was lawful? *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002). Here, the immunity question is resolved at the first prong of *Saucier*. As explained above, the uncontraverted evidence shows that the defendants did not violate plaintiff's constitutional rights.

For the reasons set forth above, defendants' motion for summary judgment must be granted and plaintiff's motion for summary judgment must be denied.

////

////

Accordingly, it is hereby RECOMMENDED that defendants' motion for summary judgment be granted, plaintiff's motion for summary judgment be denied, and that judgment be entered in favor of defendants and the Clerk be directed to close the case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 1, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE